IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG

**WILLIAM E. HALE,**

        Plaintiff,

**v.**                                **CIVIL ACTION NO. 3:11-CV-78**
                                              **(JUDGE GROH)**

**ERIN P. GIBBONS,**

        Defendant.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On this day, the above-styled matter came before the Court for consideration of the Defendant's Motion for Summary Judgment [Doc. 64], filed on November 15, 2012. This motion has since been fully briefed and is now ripe for decision. Having reviewed the record and considered the arguments of the parties, this Court **FINDS** that the Motion for Summary Judgment must be **GRANTED**.

## BACKGROUND

### I.    Factual Allegations

On May 6, 2011, Plaintiff William E. Hale, a sixty-one-year-old man, entered an Enterprise-Rent-A-Car ("Enterprise") facility in Martinsburg, West Virginia. A dispute ensued between the Plaintiff and the manager of the Enterprise facility over the availability of a vehicle. Enterprise employees asked the Plaintiff to leave but he refused.

Defendant Erin P. Gibbons, an officer with the Martinsburg Police Department, arrived in response to a call from Enterprise regarding the dispute. The Defendant found

the Plaintiff sitting on a bench in Enterprise's lobby talking on his cell phone. According to the Plaintiff, the Defendant told the Plaintiff to leave the rental agency. The Plaintiff told the Defendant he was talking to Enterprise's customer service department and would leave after he finished his phone call.

The Plaintiff alleges the Defendant became agitated and told the Plaintiff to leave the rental agency again. The Plaintiff continued his call. At that point, the Defendant allegedly began tasing the Plaintiff on the neck, shoulders, and upper back. According to the Plaintiff, even though he advised the Defendant he had a defibrillator, the Defendant continued to administer repeated shocks to the Plaintiff's neck, shoulders, and back.

Thereafter, Officer Michael Jones of the Martinsburg Police Department arrived at the scene in response to the Defendant's call for backup. Officer Jones fired two darts from his taser, striking the Plaintiff in the lower back. The Plaintiff fell to the floor, landing on his stomach. The officers handcuffed the Plaintiff, removed him from the rental agency, and placed him in the back of a squad car. The Plaintiff alleges he began to experience chest pains and requested one of his nitroglycerin pills. The Defendant allegedly refused his request. The Plaintiff was transported to the Martinsburg City Police Station, where an ambulance was dispatched. The ambulance crew advised the Plaintiff that he should go to a hospital. The Plaintiff was charged under Martinsburg, West Virginia Municipal Code §501.02(a)[1] with obstructing a law enforcement officer upon the following basis described

---

[1]

Martinsburg, West Virginia Municipal Code §501.02(a) is substantially identical to W. Va. Code §61-5-17(a). The Municipal Code provides that "[n]o person shall by threats, menaces, acts or otherwise, forcibly or illegally hinder or obstruct, any law-enforcement officer, probation officer, or parole officer acting in his or her official capacity." The State Code provides that "[a]ny person who by threats, menaces, acts or otherwise, forcibly or

by the Defendant in the narrative portion of his criminal complaint:

> I responded to 901 N. queen st. for the report of a disturbance. I spoke to employees who stated that William Hale came in earlier wanting to rent a car. They advised him that they did not have one for him today and pointed him in the direction of Charlestown. I spoke to William who stated that he was not going anywhere. I asked him what was wrong and he was complaining that the employees had swept his debit card. The employees stated the procedure for the cards and it was not in fact swept. They also advised that anytime anyone came in William would begin degrading Enterprise. He would tell them "they are going to rip you off." I told William that he needs to call the 1-800 number from somewhere else and if he has any complaints about his debit card to contact me with his account info. William continued to bad mouth Enterprise and I again asked him to leave. This is the point that he refused to even acknowledge that I was there. I said to William after asking him several times to leave that I was not going to ask him again, I am telling you t[o] leave. William stated to me, "the only way I am going to leave is by physical force." I stated to him that I could arrange that but its easier if he just left. I took the cartridge off my tazer and placed it against the back of his neck. William stated that he had a defibrillator. I told him that he still had a chance cause he was not going to like this. William said "you do what you gotta do." I grabbed his left arm as he locked it up and pulled it away from me. I gave him a 5 second burst in his left rear trap. area. It had little effect so I moved it lower on his back he began to clinch up I gave him verbal commands to get on the floor. He still refused to move and became passive resistive. I placed the tazer in the center of the back and ran another 5 sec. burst. Ptlm. Jones entered the room and instructed William to place his hands behind him. He refused so Ptlm. Jones deployed his tazer. William continued to fight going to the floor so I pushed him the rest of the way down. I contacted medics and had them dispatched where they checked and cleared William.

On May 6, 2011, the Plaintiff's daughter transported him to the Veteran's Hospital

in Martinsburg, where he was admitted for observation and treatment. He was released

---

illegally hinders or obstructs, any law-enforcement officer, probation officer or parole officer acting in his or her official capacity is guilty of a misdemeanor . . . ."

on May 9, 2011. The Plaintiff alleges the Defendant and Officer Jones' use of force resulted in more than thirty (30) burn wounds on his neck, shoulders, and back.

Various Enterprise employees provided deposition testimony in this case regarding the Plaintiff's conduct on May 6, 2011. According to Justin Carroll, the Plaintiff was "irate," and was "creating a scene in front of other customers." Carroll testified that due to the Plaintiff's behavior, the Enterprise store manager decided that Enterprise would not rent to the Plaintiff and asked the Plaintiff to leave. The Plaintiff refused to leave. Therefore, the manager pretended to make a telephone call to the police in order to encourage the Plaintiff to leave. When the Plaintiff still did not leave, the manager actually called the police.

Justin Daugherty, another Enterprise employee on duty that day, recalls that the Plaintiff did not specifically threaten anyone, but "was creating an environment that was hostile." The Plaintiff did not use profanity or shout, but did raise his voice and was upset. According to Daugherty, the Plaintiff remained seated in a chair in the lobby with his phone and remarked that he was not going to leave until he got a car, even though he had been informed Enterprise was not going to provide him with a car and he needed to leave.

The Defendant testified at his deposition that while he was on routine patrol on May 6, 2011, he responded to a call regarding a disorderly subject at Enterprise. When the Defendant arrived at the scene, he observed the Plaintiff, sitting with his cellular phone in his hand. The Plaintiff was agitated and extremely nervous. The Enterprise employees on duty advised the Defendant that they had already asked the Plaintiff to leave. The Plaintiff told the Defendant his biggest concern was the fact that his debit card had been charged.

4

According to the Defendant, he was hopeful that resolving the issue about the Plaintiff's debit card would calm the Plaintiff and convince him to leave. Therefore, the Defendant told the Plaintiff if Enterprise charged his bank account, the Plaintiff could contact the Defendant and he would address the matter with Enterprise himself. The Plaintiff responded he was not going anywhere until he had resolved his issue with Enterprise.

According to the Defendant, the Plaintiff was "speaking in circles," holding the telephone up to his ear without talking into it, then putting it down in his lap. Therefore, the Defendant concluded the Plaintiff might be mentally impaired. When the Plaintiff commented he was calling his daughter or wife to pick him up, the Defendant offered to give the Plaintiff a ride to a nearby 7-Eleven store to wait for his ride. The Defendant testified based on the Plaintiff's behavior, he feared the Plaintiff might be "buying time," and "on the brink of exploding."

Thus, the Defendant alleges he gave the Plaintiff several more orders to leave and placed a call for backup. At this point, the Plaintiff stated "the only way I'm leaving is by physical force." [Pl.'s Dep. 112:13 - 112:16 (June 29, 2012)]. The Defendant responded he could arrange that but it would be easier if the Plaintiff just left. [Pl.'s Dep. 112:13 - 112:16; Def.'s Criminal Compl. (May 6, 2011)]. The Defendant then took the cartridge off his taser and placed it against the back of the Plaintiff's neck. At that point, the Plaintiff stated that he had a defibrillator. The Defendant told the Plaintiff he still had a chance to leave. The Plaintiff responded "do what you've got to do." [Pl.'s Dep. 119:6 - 119:7].

The Defendant claims that he then grabbed the Plaintiff by his left arm, but the Plaintiff locked it up and pulled it away from him. At that point, the Defendant administered a five second burst to the Plaintiff's trapezius. According to the Defendant, the Plaintiff did

not appear to experience any pain from the initial shock. The Defendant then tased the Plaintiff again lower on his trapezius and simultaneously gave the Plaintiff a verbal command to get on the floor. After the second shock, the Plaintiff allegedly "clinched up," and started to roll forward away from the taser. The Defendant alleges that rather than remaining on the floor as commanded, however, the Plaintiff began to stand up. Therefore, the Defendant administered another five second burst to the center of the Plaintiff's back. The Plaintiff allegedly turned to face the Defendant, grabbing at the Defendant's uniform. Another scuffle allegedly ensued in which the Defendant attempted to force the Plaintiff to the floor and the Plaintiff fought to remain standing. The Defendant concedes his taser log recorded that the taser was discharged eight to nine times. According to the Defendant, he does not know if he administered the taser one time for twenty seconds or multiple times.

During the scuffle, Officer Jones arrived on the scene in response to the Defendant's call for backup. Officer Jones testified at his deposition that when he arrived at the scene, he saw the physical altercation inside through Enterprise's large glass windows. When Officer Jones entered the building, he found the Defendant backed up against a wall with the Plaintiff between the Defendant and Officer Jones. Officer Jones observed the Plaintiff's hand on either the Defendant's shirt or gun belt. Therefore, Officer Jones alleges he commanded the Plaintiff to place his hands behind his back, but the Plaintiff did not comply. Thus, Officer Jones discharged his taser, striking the Plaintiff in the back. Afterward, the Defendant was able to subdue the Plaintiff on the ground.

Both Justin Carroll and Justin Daugherty corroborated at their depositions that the Plaintiff told the Defendant he would only leave the building by force. Carroll also

corroborated that the initial taser shock appeared to have little effect on the Plaintiff and that the Plaintiff resisted the Defendant's command to get on the ground.

The Plaintiff alleges that when the Defendant entered Enterprise, the Plaintiff was seated and speaking on the telephone. He alleges he was not threatening anyone, was not disruptive, and told the Defendant he would leave as soon as he completed his call. The Plaintiff alleges he spoke in incomplete sentences to the Defendant because he was giving the Defendant the shortest answer he could while he was awaiting the resumption of his telephone call which was on hold. The Plaintiff alleges when he tried to explain to the Defendant he wanted to finish his call, the Defendant became irritated, approached the Plaintiff in a threatening manner, and began tasing him. In contradiction to the Defendant's testimony, the Plaintiff alleges the Defendant repeatedly commanded the Plaintiff to stand up as he was tasing him. After standing up, the Plaintiff alleges he was ordered to get on the ground. The Plaintiff maintains that he had difficulty getting to the floor because of his age and physical condition.

The Plaintiff denies taking any action to actively resist the Defendant or struggling with him, but concedes that he pled guilty to obstructing in municipal court. He claims that he did so because the prosecutor's plea agreement offer involved no fine or incarceration. However, the Court finds that the Plaintiff's plea of guilty is a conclusive admission to the charge of obstructing.

## II.    Procedural History

The Plaintiff filed the instant Complaint on September 16, 2011, naming as defendants Officer Gibbons, Officer Jones, and the City of Martinsburg. Count I of the Complaint alleges a federal civil rights violation pursuant to 42 U.S.C. §1983, based upon

the Defendants' alleged use of excessive force in violation of the Fourth Amendment to the United States Constitution. Count II of the Complaint alleges supplemental state law claims including assault, battery, and intentional infliction of emotional distress.

The Defendants filed a joint Motion for Summary Judgment on November 15, 2012, arguing that all three Defendants are entitled to judgment as a matter of law. The Plaintiff filed a Memorandum in Opposition to the Defendants' Motion for Summary Judgment on December 3, 2012, and a Revised Memorandum in Opposition to Defendants' Motion for Summary Judgment on December 5, 2012. The Defendants filed a Reply on December 10, 2012.

On December 7, 2012, the Court approved and entered an Agreed Order of Voluntary Partial Dismissal, dismissing Officer Jones and the City of Martinsburg as parties defendant to this action and further dismissing the Plaintiff's state law claims. Presently, the only claim remaining is the Plaintiff's §1983 claim against Officer Gibbons for excessive use of force. Officer Gibbons moves for summary judgment on the basis that he did not employ excessive force against the Plaintiff as a matter of law and is furthermore entitled to qualified immunity.[2]

---

[2]

On December 10, 2012, the Plaintiff filed a Motion to Strike Unsworn Statements Attached as Exhibits to Defendant's Memorandum Supporting Summary Judgment and Reply Brief [Doc. 94]. The Plaintiff argued that transcripts of recorded statements of two witnesses, Justin Daugherty and Kenny Roberts, which were attached as exhibits to the Defendant's motion for summary judgment and reply brief, should be stricken on grounds that they are unsworn statements and, as such, are inappropriate for consideration at the summary judgment stage. On December 12, 2012, the Defendant filed a Supplement to Reply of Defendant, to which he attached an affidavit of Kenny Roberts averring that the information contained within his recorded statement was true and accurate. On December 14, 2012, the Defendant filed a Response to Plaintiff's Motion to Strike Unsworn Statements, in which he asserted that the recorded statement of Justin Daugherty was verified and sworn to at

## **DISCUSSION**

### I. **Jurisdiction**

Pursuant to 28 U.S.C. §1331, the district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States. Because the Plaintiff alleges a violation of a federal statute, 42 U.S.C. §1983, federal question jurisdiction has been properly invoked.

### II. **Applicable Standard**

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment. *See* FED. R. CIV. P. 56. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, the Court must conduct "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd.*

Daugherty's deposition.

To the extent that the Court did not rely on either of these statements in reaching the instant decision with regard to the Defendant's summary judgment motion, the Plaintiff's Motion to Strike is **DENIED AS MOOT**.

*v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  That is, once the movant has met its burden to show absence of a genuine issue of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial.  FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 323-25; *Anderson*, 477 U.S. at 248.  A party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.  *Anderson*, 477 U.S. at 248.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249 (citations omitted).

III.     **Analysis**

         A.     **Excessive Force**

         In addressing an excessive force claim brought under §1983, the analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force.  *Graham v. Connor*, 490 U.S. 386, 394 (1989).  In most instances, that will either be the Fourth Amendment's prohibition against unreasonable seizures of the person or the Eighth Amendment's ban on cruel and unusual punishments, which are the two primary sources of constitutional protection against physically abusive governmental conduct.  The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right.  *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 7-22 (1985); *Whitley v. Albers*, 475 U.S. 312, 318-326 (1986)).

         Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of the nature and quality of the

intrusion of the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *Id.* at 396 (citing **Garner**, *supra*, at 8). "Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to enforce it." *Id.* (citing **Terry v. Ohio**, 392 U.S. 1, 22-27 (1968)). "Because '[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing **Bell v. Wolfish**, 441 U.S. 520, 559 (1979); **Garner**, 471 U.S. at 8-9).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Id.* (citing **Terry**, *supra,* at 20-22). "The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested, nor by the mistaken execution of a valid search warrant on the wrong premises." *Id.* (citing **Hill v. California**, 401 U.S. 797 (1971); **Maryland v. Garrison**, 480 U.S. 79 (1987)). "With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: 'Not every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers,' violates the Fourth Amendment." *Id.* (citing **Johnson v. Glick**, 481 F.2d 1028, 1033 (1973)). "The calculus of reasonableness must embody allowance for the fact that

police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

As in other Fourth Amendment contexts, the "reasonableness" inquiry in an excessive force case is an objective one. The question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *Id.* at 397 (citing ***Scott v. United States***, 436 U.S. 128, 137-39 (1978); ***Terry, supra***, at 21). Hence, under the Fourth Amendment "reasonableness" analysis, force is not excessive if it is objectively reasonable under the circumstances facing the officer, without regard to his underlying intent. *Id.*

The factors annunciated by the Supreme Court in ***Graham*** were adopted and applied by the Fourth Circuit in ***Lowery v. Stovall***, 92 F.3d 219 (4th Cir. 1996), wherein the Court of Appeals held that "[i]n judging the reasonableness of a seizure, we consider three factors: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade by flight." ***Lowery***, 92 F.3d at 222 (citing ***Graham***, 490 U.S. at 396).

In the case *sub judice*, the Defendant argues that with regard to the first ***Graham/Lowery*** factor, the Plaintiff disrupted the operation of a local business and disturbed the peace. With regard to the second ***Graham/Lowery*** factor, the Defendant argues that the Plaintiff exhibited behavior that was of great concern to the Defendant as it related to Plaintiff's intentions or condition, and the Plaintiff furthermore displayed various kinds of erratic behavior, which suggested to the Defendant that "something bad could

possibly happen" if the Plaintiff was not removed from Enterprise.  With regard to the third *Graham/Lowery* factor, the Defendant argues that the Plaintiff was actively resisting arrest. The Defendant thus argues that the force used against the Plaintiff was objectively reasonable under the circumstances.

Even viewing the material facts in the light most favorable to the Plaintiff as the non-moving party, the Court finds that by the Plaintiff's own admission, he disobeyed and ignored commands to leave the premises. [Pl.'s Dep. 104:10 - 104:11; 112:13 - 112:16]. In fact, the Plaintiff informed the Defendant "the only way I'm going to leave is by force" [Pl.'s Dep. 112:13 - 112:14], and "do what you've got to do." [Pl.'s Dep. 119:6 - 119:7].  By his own admission, the Plaintiff admits to speaking in incomplete sentences. [Pl's Dep. 157:4 - 157:24].  Moreover, the Plaintiff concedes he pled guilty to obstructing a law enforcement officer in municipal court, which serves as an admission for the purposes of this proceeding.  [Pl.'s Dep. 28:23 - 31:2].[3]  The Defendant deduced from the Plaintiff's refusal to leave, behavior, and demeanor that he posed a threat.  In his denial that he posed a threat or resisted arrest, the Plaintiff presents a different version of the facts described by the Defendant and the Enterprise employees.  Nonetheless, the Plaintiff's obstruction is conclusive by his admission to criminal obstruction of the Defendant in his guilty plea.

Considering the *Graham/Lowery* factors in the instant case, the Court finds that

---

[3]

According to *United States v. Parson*, 57 Fed. Appx. 134, 135 (4th Cir. 2002) (citing *United States v. Broce*, 488 U.S. 563, 569 (1989)), after a plea of guilty, a defendant no longer has the right to contest the factual merits of the charges.  By pleading guilty, the plaintiff in this action admitted that he obstructed a law enforcement officer.  He cannot now contest this admission.

the Plaintiff was trespassing on Enterprise's property once he refused their request to leave and the Plaintiff disobeyed a law enforcement officer more than once when commanded to leave.[4]  Moreover, the Defendant had reason to believe, based upon the Plaintiff's behavior and demeanor, that the Plaintiff posed an immediate threat to the safety of the Defendant and others.  Finally, the Defendant had reason to believe the Plaintiff was resisting arrest when he did not comply with the Defendant's commands after he was initially tased.  Therefore, the Defendant's conduct in further tasing the Plaintiff in order to subdue him was objectively reasonable pursuant to **Graham** and **Lowery**.  The Defendant did not club, hit, kick, or shoot the Plaintiff, nor did he tase the Plaintiff in an overly-sensitive area.  The Plaintiff was not already restrained by handcuffs or otherwise confined at the time of the Defendant's use of force.  In fact, it is uncontested that Officer Jones, upon his arrival, also determined based upon his observations to tase the Plaintiff in order to subdue him.

In **Bolden v. Rushing**, 2009 WL 1160938 (D.S.C. April 28, 2009), *aff'd*, 407 Fed. Appx. 693 (4th Cir. 2011), the United States District Court for the District of South Carolina found a law enforcement officer's use of force to be reasonable where a plaintiff was arrested after providing officers with a false name, which happened to be the plaintiff's brother's name.  Unfortunately for the plaintiff, his brother had an outstanding warrant for his arrest, so officers, believing the plaintiff to be his brother, proceeded to take the plaintiff

---

[4]

W. Va. Code §61-3B-2 provides that "[a]ny person who knowingly enters in, upon or under a structure or conveyance without being authorized, licensed or invited, or having been authorized, licensed or invited is requested to depart by the owner, tenant or the agent of such owner or tenant, and refuses to do so, shall be guilty of a misdemeanor . . . ."

into custody.  The plaintiff failed to comply with the officers' commands and resisted arrest.  In order to get the plaintiff to submit to the arrest, the officers used a taser, after warning the plaintiff that they would tase him if he did not comply.  During the altercation, the plaintiff broke his ankle.  The plaintiff pled guilty to resisting arrest in state court.  ***Bolden***, 2009 WL 1160938 at *1-2.  The Court found that in light of the plaintiff's admission to resisting arrest, the officers were entitled to use reasonable force to subdue him, including the use of the taser.  Therefore, the Court granted summary judgment to the defendant officers.  ***Id.*** at *2.

In ***Orem v. Rephann***, 523 F.3d 442 (4th Cir. 2008), a plaintiff was arrested for disrupting and assaulting an officer.  ***Orem***, 523 F.3d at 443.  The plaintiff, who was under the influence of prescription drugs, marijuana, and alcohol, was restrained, placed in handcuffs, placed in a foot restraint, and put in a police car for transport to a West Virginia regional jail.  ***Id.***  In the back of the police car, the plaintiff's jumping and banging around was so intense that the vehicle rocked, loosening the foot restraint and forcing the transporting officer to pull the vehicle over.  ***Id.***  Another officer, who had been voluntarily following the transporting officer, also stopped.  While the transporting officer attempted to tighten the foot restraint, the other officer engaged in a verbal exchange with the plaintiff, in which the plaintiff repeatedly cursed at him.  ***Id.*** at 444-45.  During this exchange, the officer tased the plaintiff twice, once under her left breast and once on her left inner thigh, leaving a permanent scar.  ***Id.*** at 445.  The Fourth Circuit found that:

> From the facts as we must view them, a reasonable jury could infer Deputy Rephann's actions were not a "good faith effort to restore order" but, rather, wanton and unnecessary.  When Deputy Boyles pulled his vehicle over and exited, it was clear

that some action was necessary to calm [the plaintiff] and safely transport her to [the regional jail]. Deputy Boyles immediately began to re-secure the [foot restraint]. Deputy Rephann, on the other hand, began talking with [the plaintiff], whom he knew because her husband was a former sheriff deputy. Deputy Rephann did not attempt to assist Deputy Boyles in tightening the [foot restraint]. Instead, he began telling [the plaintiff] she needed to calm down and refrain from moving in the vehicle. While Deputy Rephann makes much of his verbal attempts to secure order, they do not lesson the unreasonableness of his subsequent actions . . . [Deputy Rephann] maintains that he used the taser to ensure that [the plaintiff] would not endanger herself. But given that [the plaintiff] was handcuffed, weighed about 100 pounds, had her ankles loosened in the [foot restraint] which Deputy Boyles was tightening, and was locked in the back seat cage of Deputy Boyles's car until Deputy Rephann opened the door, we find this explanation tenuous at best.

*Id.* at 446-47.

The Court finds the instant case to be more analogous to **Bolden** than to **Orem**. Just as in **Bolden**, the Plaintiff in the case *sub judice* failed to comply with an officer's commands and committed the crime of obstructing a law enforcement officer. In the case at bar, the Court finds based upon the uncontested material facts that the Defendant's use of force to subdue the Plaintiff was objectively reasonable under the circumstances. The Defendant did not tase the Plaintiff in any overly-sensitive or private areas. The Plaintiff was not confined, handcuffed, or shackled at the time the force was used, and the Plaintiff was not a small-framed female. In addition, unlike in **Orem**, the second officer on the scene also found the need to tase the Plaintiff. Therefore, the Defendant's motion for summary judgment on the issue of excessive force is **GRANTED**.

**B.     Qualified Immunity**

Even where a law enforcement officer's use of force is found to be excessive, he might nevertheless be entitled to a defense based upon qualified immunity.  The defense of qualified immunity is secondary to a defense that an officer did not exert excessive force.  The tests for excessive force and qualified immunity are separate and distinct.  "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct."  ***Saucier v. Katz***, 533 U.S. 194, 205 (2001).  "It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts."  ***Id.*** "An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances." ***Id.***  "If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense."  ***Id.***

In ***Saucier***, the Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims.  First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right.  ***Saucier***, 533 U.S. at 201.  Second, if the plaintiff has satisfied the first step, the court must decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct.  ***Id.***

In ***Pearson v. Callahan***, 555 U.S. 223, 236 (2009), the Supreme Court held that while ***Saucier's*** two-step sequence for resolving government officials' qualified immunity claims  is often appropriate, courts may exercise their discretion in deciding which of the

two prongs should be addressed first in light of the circumstances in the particular case at hand.

With regard to the first prong of the **_Saucier/Pearson_** analysis, whether, taken in the light most favorable to the party asserting the injury, there has been a violation of a constitutional right, the analysis is identical to the Fourth Amendment excessive force analysis contained within **_Graham v. Connor_**, *supra*. *See* **_Saucier_**, 533 U.S. at 201-202 ("[T]here is no doubt that **_Graham v. Connor_** clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness.").

With regard to the second prong of the **_Saucier/Pearson_** analysis, the question is whether the right identified under the first prong of the analysis was "clearly established," such that "the contours of the right [would be] sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right." **_Saucier_**, 533 U.S. at 202. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." **_Id._** (citing **_Wilson v. Layne_**, 526 U.S. 603, 615 (1999)).

"[T]he determination whether a reasonable person in the officer's position would have known that his conduct would violate the right at issue must be made on the basis of information actually possessed by the officer at the critical time, or that was then reasonably available to him, and in light of any exigencies of time and circumstance that reasonably may have affected the officer's perceptions." **_Pritchett v. Alford_**, 973 F.2d 307, 312-313 (4th Cir. 1992) (citing **_Anderson v. Creighton_**, 483 U.S. 635, 641 (1987); **_Harlow_**

*v. Fitzgerald*, 457 U.S. 800, 815 (1982); *Malley v. Briggs*, 475 U.S. 335, 350 (1986)).

"The tolerance thus accorded by the qualified immunity defense to 'good faith' mistakes of judgment traceable to unsettled law, or faulty information, or contextual emergencies, is deliberately designed to give protection to 'all but the plainly incompetent or those who knowingly violate the law.'" *Pritchett*, 973 F.2d at 313 (citing *Malley*, 475 U.S. at 341). *Compare* **Henry v. Purnell**, 652 F.3d 524 (4th Cir. 2011) (qualified immunity not applicable to officer who shot defendant with his service revolver when he had intended to shoot defendant with a taser) *with* **Phillips v. Peddle**, 7 Fed. Appx. 175,180 (4th Cir. 2001) (where neither the Supreme Court nor the Fourth Circuit had addressed the applicability of the "community caretaker" exception to a warrantless entrance of a private residence, and Virginia case law on the subject was ambiguous, qualified immunity would shelter officer from liability) (citing **Wilson v. Layne**, 141 F.3d 111 (4th Cir. 1998) ("[t]he law is clearly established such that an officer's conduct transgresses a bright line when the law has 'been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state.'")).

In the case at hand, the Defendant argues that the "clearly established" standard for the use of force at the time of the incident is "whether a reasonable officer would believe Plaintiff, who has violated a lawful order, thereby committing a crime, is actively resisting, and who states he will only comply if taken by force, can be tased until he is compliant and/or subdued."  The Defendant argues that neither the Supreme Court, the Fourth Circuit, or the district or state courts of West Virginia have addressed this particular area of the law, and he should therefore be given the benefit of the doubt. *See, e.g.,* **Oliver v.**

*Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009) ("if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.") (internal quotations and citations omitted).

With regard to the first *Saucier/Pearson* factor, for the same reason that the Defendant is entitled to summary judgment on the Plaintiff's claim of excessive force, the Plaintiff cannot demonstrate that his constitutional rights have been violated. The Defendant's use of force in order to subdue the Plaintiff was objectively reasonable under the circumstances pursuant to the Court's *Graham* and *Lowery* analysis.

Moreover, even if the Plaintiff could demonstrate deprivation of a constitutional right, he would not be able to satisfy the second *Saucier/Pearson* factor by demonstrating that such right was "clearly established." It is uncontested that the Plaintiff disobeyed lawful orders to leave the premises, obstructed a law enforcement officer, stated that he would only comply if taken by force, and when shown the taser stated "you do what you've got to do." Viewing the situation through the lens of information actually possessed and observed by the Defendant at the time of the use of force in question, the Defendant had reason to believe that the Plaintiff posed an immediate threat to the safety of the Defendant and others. The Defendant's initial use of force was met with resistance by the Plaintiff and, in response, more force was used in order to subdue the Plaintiff. Such conduct was neither "plainly incompetent," nor was it in "knowing violation" of the law. *See* **Malley**, *supra*. Therefore, the Defendant's motion for summary judgment on the basis of qualified immunity is **GRANTED**.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment is **GRANTED**.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record and/or *pro se* parties.

**DATED:** January 3, 2013

GINA M. GROH
UNITED STATES DISTRICT JUDGE